**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| BANK MIDWEST, N.A., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No.10-2387-JAR |
| | ) |
| CRAIG J. MILLARD, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

Plaintiff Bank Midwest, N.A. ("Bank Midwest") brings this lawsuit against Defendants Charles Castor and Craig J. Millard seeing to collect on guaranties made by Defendants. This matter is before the Court on Bank Midwest's Motion for Summary Judgment (Doc. 48) and Motion for Sanctions against Defendant Millard for failure to comply with this Court's discovery orders (Doc. 52). Defendant Millard has not responded to either motion and the time to do so has expired.[1] As explained more fully below, Bank Midwest's motion for summary judgment is granted, and its motion for sanctions is denied as moot.

**I.   Summary Judgment Standard**

Under D. Kan. Rule 7.4, a "failure to file a brief or response within the time specified . . . shall constitute a waiver of the right thereafter to file such brief or response. . . ."[2] Furthermore, if a "respondent fails to file a response within the time required . . . the motion will be considered

---

[1] *See* D. Kan. R. 6.1(d)(2) (requiring a response to a non-dispositive motion to be filed within 14 days and a response to a dispositive motion to be filed within 21 days).

[2] D. Kan. R. 7.4.

and decided as an uncontested motion and ordinarily will be granted without further notice."[3] Nevertheless, "[i]t is improper to grant a motion for summary judgment simply because it is unopposed."[4] This will be the case where the movant fails to make out a prima facie case for summary judgment.[5] It is the role of the court to ascertain whether the moving party has sufficient basis for judgment as a matter of law.[6] In so doing, the court must be certain that no undisclosed factual dispute would undermine the uncontroverted facts.[7]

Summary judgment is appropriate if the moving party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law."[8] A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[9] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[10] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[11]

The moving party bears the initial burden of providing the court with the basis for the

---

[3] *Id.*

[4] *Thomas v. Bruce*, 428 F. Supp. 2d 1161, 1163 (D. Kan. 2006) (quoting *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F. Supp. 406, 407 (D. Kan. 1986) (citing *Hibernia Nat'l Bank v. Administracion Ctl. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985))). The Court notes, however, that failing to file a timely response to a motion for summary judgment still waives the right to thereafter respond or otherwise controvert the facts alleged in the motion. D. Kan. R. 7.4.

[5] *Thomas*, 428 F. Supp. 2d at 163 (citations omitted).

[6] *Id.* (citing *Lady Baltimore Foods*, 643 F. Supp. at 407).

[7] *Id.*

[8] Fed. R. Civ. P. 56(a).

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10] *Id.*

[11] *Id.* at 251–52.

motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[12]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[13]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[14]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15]  When examining the underlying facts of the case, the court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[16]

Because Defendant is a *pro se* litigant, the court must construe his pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[17]  However, the court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[18]  The court need only accept as true the plaintiff's "well-pleaded factual contentions, not his conclusory allegations."[19]  Additionally, a *pro se* litigant is

---

[12]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[13]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[14]*Id.*

[15]*Id.*

[16]*See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[17]*Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[18]*Id.*

[19]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citation omitted).

not excused from complying with the rules of the court and is subject to the consequences of noncompliance.[20]

## II. Uncontroverted Facts

All material facts set forth by Bank Midwest are deemed admitted for the purpose of summary judgment, as Defendant failed to specifically controvert them as required under Fed. R. Civ. P. 56(e)(2) and D. Kan. R. 56.1(a).[21]

### *The Parties*

The former plaintiff in this action, Hillcrest Bank ("State Bank") was a state-chartered banking corporation registered and authorized to do business in the State of Kansas. On October 22, 2010, State Bank, chartered under the laws of the State of Kansas, was closed by regulatory authorities and certain of its assets, including the loans and guaranties that are the subject of this action, were transferred to Hillcrest Bank, N.A. (the "Assignor Bank") by the Federal Deposit Insurance Corporation (the "FDIC"), as receiver of State Bank. On or about November 7, 2010, the Assignor Bank merged with and into Bank Midwest. As a result of this merger, Assignor Bank transferred and assigned its entire interest in the subject loans and guaranties, including all interest in this action, to Bank Midwest, which was substituted as party plaintiff in this case.[22]

Defendant Craig J. Millard is, and has been at every relevant time, an individual who does not reside in Kansas.

---

[20]*Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (insisting that *pro se* litigants follow procedural rules and citing various cases dismissing *pro se* cases for failure to comply with the rules)).

[21]That rule provides: "All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D. Kan. Rule 56.1(a).

[22]Doc. 25.

*Loan Agreement and Guaranties*

On July 12, 2005, State Bank and G & H Beach Development ("G & H") entered into a Construction Loan Agreement (the "Loan Agreement") whereby State Bank agreed to loan G & H up to $35 million.[23] Pursuant to the terms of the Loan Agreement, and contemporaneously therewith, G & H executed a Promissory Note (the "First Note") for the principal sum of $35 million in favor of State Bank.[24] In connection with G & H's execution of the First Note, Defendant Millard executed and delivered to State Bank a continuing and unlimited guaranty (the "First Guaranty").[25] Under the terms of the First Guaranty, Millard agreed to "absolutely and irrevocably" guarantee the obligations of G & H under the Loan Documents. Millard also entered into a Completion Guaranty.[26]

State Bank loaned G & H money pursuant to the terms of the First Note and Loan Agreement. The Maturity Date, as defined by the First Note, for full repayment of the entire principal balance and unpaid interest was August 1, 2006. There were ten subsequent modifications to the Loan Agreement and First Note that ultimately extended the Maturity Date to December 31, 2009.[27] The First Note is now fully matured. During the course of the loan, the Residential Lot Proceeds never exceeded $17,750,000.00 as defined in the Loan Agreement and the First Guaranty. Neither G & H nor Millard completed construction pursuant to the terms of the Loan Agreement.

---

[23] Doc. 49, Ex. A.

[24] *Id.*, Ex. B.

[25] *Id.*, Ex. C.

[26] *Id.*, Ex. D.

[27] *Id.*, Ex. E.

On or about December 8, 2008, G & H executed a second Promissory Note (the "Second Note") for the principal sum of $8 million in favor of State Bank.[28] In connection with G & H's execution of the Second Note, Millard executed and delivered to State Bank a continuing and unlimited guaranty (the "Second Guaranty").[29] Under the terms of the Second Guaranty, Millard agreed to "jointly and severally, absolutely and unconditionally and irrevocably" guarantee the obligations of G & H under the Loan Documents, including the Second Note. State Bank loaned G & H money pursuant to the terms of the Second Note. The Maturity Date, as defined in the Second Note, for full repayment of the entire principal balance and unpaid interest to State Bank by G & H was December 31, 2009. The Second Note has now fully matured.

### *Breach and Default*

G & H failed to make the payment required under the First Note, and caused a demand letter to be sent to Millard on or about September 9, 2009. Millard failed to pay amounts due and owing pursuant to the First Guaranty, and failed to complete construction as required by the Completion Guaranty. G & H also failed to make payments required under the Second Note, and Millard failed to pay the amounts due and owing under the Second Guaranty.

A waiver provision is found at Section 5 of the First Guaranty, which states in relevant part:

> § 5   GUARANTY ABSOLUTE, NOT RELEASED OR IMPAIRED. The obligations of Guarantors hereunder are continuing, absolute, and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Obligations or any of the Loan Documents or security for any of the obligations or any other instruments or documents contemplated by the Loan Documents or

---

[28] *Id.*, Ex. F.

[29] *Id.*, Ex. G.

> executed and delivered in connection with the Note, and irrespective of any other circumstance other than payment whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety. . . .

Section 8 of the First Guaranty states:

> § 8   LENDER NOT REQUIRED TO PURSUE OTHER REMEDIES. This is a guaranty of payment, and not merely of collection. Lender may proceed directly against any or all of the Guarantors whenever any payment or performance required pursuant to the Obligations not made or rendered to Lender without being required to proceed first against Borrower or any other Guarantor or any other person or entity, or against any security for Borrower's or any Guarantor's Obligations under the Loan Documents or hereunder.

The Second Guaranty has similar language in Sections 4 and 7.

Both Notes provide that an "Event of Default" shall mean an "'Event of Default' as defined in the Loan Agreement.'" The Loan Agreement states:

> § <u>EVENTS OF DEFAULT</u>.  An "<u>Event of Default</u>" shall exist if any one of more of the following events shall occur and be continuing:
>
>   (a)   any sum of money coming due under the Note, whether principal, interest, late charges, or otherwise, is not paid when due;
>
>   (b)   any sum of money coming due under this Loan Agreement or under any of the other Loan Documents (other than the Note) is not paid when due and such default continues from a period of five (5) days after written notice thereof from Lender to Borrower;

G & H is in default under the Notes and Loan Agreement.

### *Deeds of Trust/Security Interest*

In July 2005, G & H executed a Construction Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing, securing payment of the First Note and other

7

obligations of G & H ("Deed of Trust").[30] The Deed of Trust created a first mortgage lien on the Mortgage Property, as defined therein ("Mortgage Property"). In September 2006, G & H executed a Supplemental Deed of Trust (with Security Agreement and Assignment of Rents and Leases) ("Supplemental Deed of Trust").[31] The Supplemental Deed of Trust included additional property within the Mortgage Property, as specified in the Deed of Trust. The Mortgage Property now secured under the Deed of Trust presently includes, without limitation, the Newport Dunes Golf Course.

In December 2008, G & H executed a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "December 2008 Deed of Trust," and collectively with the Deed of Trust, the "Deeds of Trust").[32] The Deeds of Trust state:

> 11.2   Remedies Upon an Event of Default
>
> (b) <u>Other Remedies</u>. Upon the occurrence of any Event of Default, Lender and/or Trustee may immediately undertake any one or more of the following:
>
> (2) <u>Entry</u>. Lender personally, or by its agents or attorneys, may enter into and upon any of the Mortgaged Property and may . . . (i) use, operate, manage and control the Mortaged Property and conduct the business there of . . . and exercise all rights and powers of Grantor with respect thereto . . . either in the name of Grantor or otherwise as Lender shall deem best; (ii) restore the Mortgaged Property; (iii) complete the construction of any Improvements under construction or renovation and in the course of such completion may make such changes in the contemplated or completed Improvements as Lender may deem desirable and may insure the same; and (iv) do all such Maintenance as to Lender may reasonably seem advisable. Lender shall be entitled to collect and receive all rents, and after deducting the expenses of conducting the business thereof and of all necessary maintenance and other proper charges upon any of the Mortgaged Property, as well as just and

---

[30]*Id.*, Ex. H.

[31]*Id.*, Ex. I.

[32]*Id.*, Ex. J.

>reasonable compensation for the services of Lender and for all attorneys and agents properly engaged and employed by Lender, Lender shall apply the remaining Rents in such order as Lender may elect, to the payment of the Debt and/or performance of the Obligations, and the payment of any other sums required to be paid by Grantor under any of the Loan Documents. Lender shall be liable to account only for Rents actually received by Lender.

State Bank advanced $50,000 as additional operating capital to the Newport Dunes Golf Course, part of the Mortgaged Property, at the request of G & H and Millard. State Bank issued a letter of credit in favor of the State of Texas due to sales taxes affecting the Mortgaged Property.

*Foreclosure*

On May 3, 2010, G & H filed bankruptcy in the Southern District of Texas. Following the lifting of the bankruptcy stay, Bank Midwest foreclosed on certain parcels of the Mortgaged Property. On January 3, 2012, Bank Midwest was the last and highest bidder for the foreclosed real property with a fair and reasonable bid of $22,845,000.00 ("Foreclosure Sale"). Bank Midwest credited the $22,845,000.00 toward the principal amount then owing under the Loan Documents.

*Damages*

Under the terms of the Loan Agreement and First Note as modified, as of July 13, 2012, the Borrower owes Bank Midwest principal of $15,370,858.22, accrued interest in the amount of $5,059,295.83, default interest in the amount of $3,640,225.36, with per diem interest accruing at a rate of $5,337.10 after July 13, 2012, and late charges of $10,695.68, plus expenses.

Under the terms of the Second Note as of July 13, 2012, the Borrower owes Bank Midwest principal of $3,252,405.62, accrued interest in the amount of $1,288,460.35, default interest in the amount of $775,304.93, with per diem interest accruing at a rate of $1,129.30 after

July 13, 2012, and late charges of $2,179.72, plus expenses.

As a result of the default by the Borrower, Bank Midwest has incurred expenses and paid fees associated with the property that secured the loan transactions and the enforcement of the Borrower's and Guarantors' obligations.  The fees paid are $2,227,038.04 and are characterized as follows:

- a. Property Maintenance Fees:
  - i. Transfer taxes/fees: $5,000.00
  - ii. Real estate taxes: $725,219.75
  - iii. Property insurance: $1,679.76
  - iv. Golf course operations: $816,361.96
  - v. Payroll: $19,000.00
  - vi. Benefits: $8,500.00
  - vii. Sales tax: $7,860.00
- b. Loan/Bank Expenses:
  - i. Marketing Consultant: $32,520.49
  - ii. Appraisals: $47,000.00
  - iii. Miscellaneous: $1,000.00
- c. Legal expenses: $562,896.09
- d. Total: $2,227,038.04

In connection with the Loan Documents, Bank Midwest employed and paid Legal Expenses to Lewis Rice & Fingerish ("Lewis Rice") in connection with the preparation and enforcement of the Loan Documents in the amount of $12,546.88; to Bracewell & Giuliani, LLP ("Bracewell") in connection with the bankruptcy of Borrower and the foreclosure on the

property in the amount of $436,808.02; and to Spencer Fane Britt and Browne LLP ("Spencer Fane") in connection with efforts to enforce the Guaranties against Defendants in the amount of $113,541.19. As of July 13, 2012, G & H owes Bank Midwest a total of $31,626,463.75. The Notes and Loan Agreements continue to accrue interest at the contract rate.

## IV.     Discussion

### A.     Guaranty Agreements

Bank Midwest asserts two counts of breach of contract against Defendant Millard seeking to recover on the guaranties of the First Note and Second Note. "A guaranty involves a tripartate relationship based on a contract between two or more persons by which one person promises to answer for the debt of a third person."[33] The rules governing the interpretation of contracts generally apply to the interpretation and construction of contracts of guaranty.[34]

The elements for a breach of contract claim under Kansas law[35] are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff suffered damage caused by the breach.[36]

Here, the record shows that Bank Midwest is entitled to recover on the guaranties. Two contracts existed between Bank Midwest and Millard in which Millard agreed to "absolutely and unconditionally and irrevocably" guaranty the obligations of G & H to pay all amounts due and

---

[33] *United States v. Healy*, 923 F. Supp. 1424, 1427 (D. Kan. 1996).

[34] *Botkin v. Sec. State Bank*, 130 P.3d 92, 96 (Kan. 2006).

[35] The Loan Documents all state that the contracts are governed by the laws of Kansas.

[36] *See, e.g., Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

owing under the Loan Documents.  The guaranties were supported by sufficient consideration.[37] Bank Midwest performed in compliance with the contracts as G & H was able to borrow the amounts specified under the Loan Agreement and Notes.  G & H has failed to pay Bank Midwest all amounts due and owing under the Loan Agreements and Notes and Millard, despite demand, has failed to pay pursuant to the terms of the guaranties.  Finally, Bank Midwest has been damaged by Millard's failure to pay moneys owed to the Bank pursuant to the terms of the guaranties in the amount of $26,308.113.13, plus interest, on Count I,[38] and $5,318,350.62, plus interest, on Count II.   Accordingly, Bank Midwest is entitled to summary judgment on its claims to recover on the guaranties in these amounts.

### B. Affirmative Defenses[39]

Millard's guaranty is an "unconditional guaranty," as he expressly agreed that his obligations to pay pursuant to the guaranties were absolute and unconditional.  Unconditional guaranties give the creditor the absolute right to proceed against the guarantor without regard to other collection mechanisms allowed by law.[40]  Millard does not contest that he is an unconditional guarantor under the Loan Agreement and Notes, but relies solely on four affirmative defenses.[41]  Because Millard has the burden of proof on his affirmative defenses,

---

[37]*See State ex rel. Ludwick v.Bryant*, 697 P.2d 858, 861(Kan. 1985) (holding consideration of a written contract is presumed unless the lack of consideration is raised as an affirmative defense and proved by substantial evidence); K.S.A. § 16-108.

[38]This amount is subject to the Court's determination on reasonable attorney's fees, *see supra* section IV.C.

[39]Defendant Millard's Motion for Leave to Amend Answer with Additional Claims was denied on September 12, 2012.  Doc. 53.

[40]*See United States v. Healy*, 923 F. Supp. 1424 (D. Kan. 1996); *Kan. St. Bank & Trust Co. v. Delorean*, 640 P.2d 343, 350 (Kan. Ct. App. 1982).

[41]The Court granted Bank Midwest's Motion to Dismiss Millard's counterclaims and Motion to Strike one of his affirmative defenses. Doc. 43.

movant Bank Midwest may "satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of nonmovant's claims."[42] The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."[43] As a result of Millard's failure to submit any evidence on any of his affirmative defenses, summary judgment is appropriate.

Further, Bank Midwest is entitled to summary judgment because none of Millard's affirmative defenses have merit. First, Millard contends that Bank Midwest "fail[ed] to mitigate damages." The guaranties provide, in relevant part,

> The obligations of Guarantors hereunder are continuing, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Obligations or any of the Loan Documents [ . . . ] and irrespective of any other circumstance other than payment whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

Millard also expressly agreed that Bank Midwest may "proceed directly against any or all of the Guarantors . . . without being required to proceed first against Borrower or any other Guarantor." Thus, Bank Midwest is not required to proceed against any other party or take any other affirmative action before seeking payment from the Guarantor. Where, as here, a guaranty agreement is "absolute and unconditional," a guarantor may prospectively waive any defenses to enforcement of the contract, including but not limited to the failure to mitigate damages.[44] Because Millard clearly consented to less vigorous debt collection procedures, he has waived

---

[42]*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotations omitted).

[43]*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e).

[44]*Delorean*, 640 P.2d at 352-53; *Healy*, 923 F. Supp. at 1429-30.

any defense that Bank Midwest failed to mitigate its losses.

Second, Millard claims that Bank Midwest is not the real party in interest. As the record shows, however, State Bank, the original bank that issued the loans in this matter, was closed and placed in FDIC receivership, and thus ceased to exist.[45] The loans and guaranties that are the subject of this action were transferred and assigned to Assignor Bank, which, by virtue of the merger between it and Bank Midwest, were transferred and assigned to Bank Midwest.[46] Plaintiff Bank Midwest was substituted as the party plaintiff and is the real party in interest in this case, and Millard has produced no information or evidence to suggest otherwise.

Third, Millard asserts that "Plaintiff's claims are barred, in whole or in part, because [P]laintiff breached its duty to exercise good faith and fair dealing under the Loan Agreement." As previously discussed, Millard has waived any contract defenses under the terms of the unconditional guarantee. Moreover,

> [T]he implied duty of good faith and fair dealing is part of every contract (except those involving employment-at-will) and any violation of that duty is a breach of contract. Hence, in order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for "breach of contract," not a separate cause of action for "breach of duty of good faith," and (2) point to a term in the contract "which the defendant allegedly violated by failing to abide by the good faith spirit of that term."[47]

Here, Millard neither pleads a cause of action for breach of contract nor points to any term in the

---

[45] *McAninch v. Wintermute*, 491 F.3d 759, 767 (8th Cir. 2007).

[46] *See Nolte Assoc., Inc. v. Hotel Gold Crown Champa, LLC*, Case No. 11-cv-00508, 2012 WL 32662, at *5 (D. Colo. Jan. 6, 2012) ("No one doubts that FDIC became the real party in interest after its appointment as receiver"); *Mountain States Fin. Res. Corp. v. Agrawal*, 777 F. Supp. 1550, 1552 (W.D. Okla. 1991) (holding that an assignee from the FDIC acquires all the FDIC's rights and liabilities in the assignment).

[47] *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996) (quoting *Pizza Mgmt. v. Pizza Hut*, 737 F. Supp. 1154, 1184 (D. Kan. 1990)).

contract that Bank Midwest allegedly violated.

Finally, Millard asserts that Bank Midwest has "fail[ed] to join persons needed for just adjudication." Millard has not sought to join any other party to this action under Fed. R. Civ. P. 19 or any other rule, nor has he even identified the absent party he claims is necessary under that rule. The Court's March 2012 deadline for adding parties has long passed without action by Millard, and this affirmative defense fails as well.

### C.    Reasonable Attorneys' Fees

Bank Midwest also seeks its reasonable attorneys' fees in the amount of $562,896.09. The Loan Documents state that in the event of default, the borrower agrees to pay the holder of the Note "reasonable attorneys' fees as permitted by law" incurred by the holder in trying to collect on the Note. Kansas law enforces these types of contract terms.[48] The burden is on the party requesting the fees to show their reasonableness.[49] Reasonableness is determined by applying the factors set forth in KRPC 1.5(a): (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and lenght of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers

---

[48]*See Boston Hannah Int'l, LLC v. Am. Acad. of Family Physicians*, Case No. 10-2510-CM, 2012 WL 137870, at *9 (D. Kan. Jan. 18, 2012) (citing *Farmers Cas. Co. v. Green,* 390 F.2d 188, 192 (10th Cir.1968)).

[49]*Westar Energy, Inc. v. Lake,* 552 F.3d 1215, 1229 (10th Cir. 2009); *Westar Energy v. Wittig,* 235 P.3d 515, 532 (Kan. Ct. App. 2010).

performing the services, and (8) whether the fee is fixed or contingent.[50]  A trial judge, based upon experience and knowledge of the legal profession, is deemed an expert on attorney's fees and may draw on that expertise in rendering an award in a particular case.[51]  The determination of the reasonable value of attorney's fees lies within the sound discretion of the trial court.[52]

In ruling on the reasonableness of the time and labor expended in the litigation of this case, the Court must begin by determining the amount of hours reasonably expended on the litigation.  The burden is on the applicant to prove that the hours billed are reasonable "by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks."[53]

Bank Midwest has submitted affidavits of counsel from each of the three law firms retained that summarize and describe the nature of the legal work performed, the rates charged for attorneys and paralegals and billing protocols followed by each firm.[54]  Attached as exhibits to each affidavit is a summary chart itemization of fees and expenses, showing the total of each bill and the date sent.  However, Bank Midwest has not submitted evidence in the form of detailed, contemporaneous time records that the Court is required to review to determine if Bank

---

[50]*See Johnson v. Westhoff Sand Co.,* 135 P.3d 1127, 1135–36 (Kan. 2006).

[51]*Thoroughbred Assocs., LLC v. Kansas City Royalty Co., LLC,* 248 P.3d 758, 774 (Kan. Ct. App. 2011).

[52]*See City of Wichita v. BG Prods., Inc.,* 845 P.2d 649, 653 (Kan. 1993).

[53]*Case v. Unified Sch. Dist. No. 233,* 157 F.3d 1243, 1250 (10th Cir.1998); *Kan. Penn Gaming, LLC v. HV Properties of Kan., LLC*, 790 F. Supp. 2d 1307, 1316 (D. Kan. 2011).

[54]Doc. 49, Ex. L, M, N.

16

Midwest has established its reasonable attorneys' fees. Accordingly, Bank Midwest shall submit sufficient evidence to establish its reasonable attorneys' fees by October 9, 2012; Millard may file a reply by October 23, 2012.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff Bank Midwest's Motion for Summary Judgment (Doc. 48) against Defendant Millard on Counts I and II of its Complaint is GRANTED;

**IT IS FURTHER ORDERED** that Bank Midwest shall submit evidence of its reasonable attorneys' fees on or before **October 9, 2012**; Millard shall respond on or before **October 23, 2012**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions (Doc. 52) for failure to comply with discovery order is **DENIED as moot.**

**IT IS SO ORDERED.**

Dated: September 24, 2012

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE